**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| Jessica E. Tyrone, | : | Case No. 1:13 CV 28 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Commissioner of Social Security, | : | **REPORT AND** |
| | : | **RECOMMENDATION** |
| Defendant, | : | |

## I. INTRODUCTION

Plaintiff Jessica E. Tyrone ("Plaintiff") seeks judicial review, pursuant to 42 U.S.C. § 405(g) of

Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying her claim

for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II

and XVI, respectively, of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 (Docket No. 1).

Pending are the parties' Briefs on the Merits (Docket Nos. 13 and 14) and Plaintiff's Reply (Docket

No. 15). For the reasons that follow, the Magistrate recommends the decision of the Commissioner be

affirmed in part and reversed and remanded in part.

1

## II. PROCEDURAL BACKGROUND

On May 28, 2009, Plaintiff filed an application for a period of DIB under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 (Docket No. 11, pp. 154-55 of 1107). On that same day, Plaintiff filed an application for SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381 (Docket No. 11, pp. 151-53 of 1107). In both applications, Plaintiff alleged a period of disability beginning April 1, 2008 (Docket No. 11, pp. 151, 154 of 1107). Plaintiff's claims were denied initially on September 23, 2009 (Docket No. 11, pp. 104, 108 of 1107), and upon reconsideration on February 26, 2010 (Docket No. 11, pp. 113, 116 of 1107). Plaintiff thereafter filed a timely written request for a hearing on April 27, 2010 (Docket No. 11, p. 121 of 1107).

On March 23, 2011, Plaintiff appeared with counsel for a hearing before Administrative Law Judge C. Howard Prinsloo ("ALJ Prinsloo") (Docket No. 11, pp. 37-76 of 1107). Also appearing at the hearing was an impartial Vocational Expert ("VE") (Docket No. 11, pp. 70-75 of 1107). ALJ Prinsloo found Plaintiff to have a severe combination of status post gastric bypass and hernia repair surgeries with complications, drug abuse disorder, chronic pain disorder, anxiety disorder, post traumatic stress disorder ("PTSD"), and depressive disorder with an onset date of April 1, 2008 (Docket No. 11, p. 19 of 1107).

Despite these limitations, ALJ Prinsloo determined, based on all the evidence, that Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of her decision (Docket No. 11, p. 29-30 of 1107). ALJ Prinsloo found Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels with the following non-exertional limitations: (1) no more than superficial interaction with the public or coworkers; and (2) no work at a strict production-rate pace (Docket No. 11, p. 21 of 1107). Plaintiff's

2

request for benefits was therefore denied (Docket No. 11, pp. 29-30 of 1107).

On January 7, 2013, Plaintiff filed a Complaint in the Northern District of Ohio, Eastern Division, seeking judicial review of her denial of DIB and SSI (Docket No. 1). In her pleading, Plaintiff alleged the ALJ erred by committing multiple errors involving physician opinions, residual functional capacity assessments, past relevant work, and VE testimony (Docket No. 1). Defendant filed its Answer on March 13, 2013 (Docket No. 10).

### III. FACTUAL BACKGROUND

#### A. THE ADMINISTRATIVE HEARING

An administrative hearing convened on March 23, 2011 (Docket No. 11, pp. 37-75 of 1107). Plaintiff, represented by attorney Kirk B. Roose, appeared and testified in Cleveland, Ohio (Docket No. 11, pp. 43-69 of 1107). ALJ Prinsloo presided via video from St. Louis, Missouri (Docket No. 11, p. 37 of 1107). Also present and testifying was VE Evelyn Sindelar ("VE Sindelar") (Docket No. 11, pp. 70-75 of 1107).

#### 1. PLAINTIFF'S TESTIMONY

During the administrative hearing, Plaintiff gave testimony concerning multiple areas of her life, including residual functional capacity, education and work history, and physical and mental impairments (Docket No. 11, pp. 43-69 of 1107). Although she did not graduate from high school, Plaintiff completed her GED and started, but never finished, cosmetology school (Docket No. 11, pp. 43-44 of 1107). According to Plaintiff, her cosmetology schooling involved 1,500 hours of instruction, of which she completed 1,200 hours (Docket No. 11, p. 61 of 1107). In the past, Plaintiff has worked in fast food restaurants and in hospitals and nursing homes, and delivered mail (Docket No. 11, p. 50 of 1107). Her longest-held and most recent job was as a security guard for U.S. Security (Docket No.

3

11, p. 50 of 1107). Plaintiff stated she cannot return to this job given her anxiety, loss of peripheral vision, pain, and medication side effects (Docket No. 11, p. 62 of 1107).

Plaintiff's physical and mental health issues are numerous, the most pervasive being her chronic pain (Docket No. 11, p. 54 of 1107). Plaintiff underwent gastric bypass surgery[1] and claims she is disabled because of the issues that arose after that surgery (Docket No. 11, p. 52 of 1107). In 2008, Plaintiff had hernia surgery which resulted in methicillin-resistant staphylococcus aureus ("MRSA")[2] in her abdomen (Docket No. 11, pp. 44-45 of 1107). To recover from this infection, Plaintiff was placed in a nursing home for one and a half months (Docket No. 11, p. 44 of 1107). In August 2008, Plaintiff underwent abdominal reconstruction surgery to remove the mesh causing her MRSA infection (Docket No. 11, p. 65 of 1107). At the time of the hearing, Plaintiff was suffering from another infection as a result of a recent thighplasty (Docket No. 11, p. 45 of 1107).

Plaintiff testified that, in addition to issues relating to her surgeries and subsequent infection, she was shot in the face (Docket No. 11, p. 62 of 1107). According to Plaintiff, some friends got into her father's gun cabinet and somehow a gun discharged, leaving Plaintiff with two hundred black pellets embedded in her body (Docket No. 11, pp. 62-63 of 1107). Plaintiff never had surgery to remove the pellets (Docket No. 11, p. 63 of 1107).

As a result of Plaintiff's medical conditions, she was diagnosed with a pain condition and sent for pain management (Docket No. 11, p. 47 of 1107). Plaintiff testified she suffers from chronic pain in

---

[1] Plaintiff testified she underwent gastric bypass surgery in 2005 (Docket No. 11, p. 52 of 1107). Medical records indicate Plaintiff actually had this procedure in June 2006 (Docket No. 11, p. 768 of 1107).

[2] A strain of staphylococcus aureus resistent to methicillin. MRSA is resistant to most antiobiotics and is usually acquired in hospitals or nursing homes, spread from patient to patient by contaminated hands, clothing, and equipment. Infection with MRSA can range from pneumonia to flesh-eating diseases. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

her head, face, arm, leg, and abdomen (Docket No. 11, p. 49 of 1107). To treat this pain, Plaintiff was prescribed multiple pain medications, including Methadone, Neurontin, Zanaflex, and Percocet (Docket No. 11, p. 48 of 1107). Plaintiff initially denied any alcohol or illegal drug use (Docket No. 11, p. 53 of 1107), but later admitted an opioid dependence (Docket No. 11, pp. 66-67 of 1107).

Since her time in the nursing home, during which, as Plaintiff stated, she was "pretty much dying," Plaintiff has suffered from anxiety and stress, for which she receives counseling and medication (Docket No. 11, p. 49 of 1107). According to Plaintiff, the medication only helps sometimes (Docket No. 11, p. 50 of 1107).

With regard to her residual functional capacity, Plaintiff stated she can get up and bathe by herself every day (Docket No. 11, p. 54 of 1107). She testified she cannot walk a long amount, indicating she can walk around the house but likely not one mile (Docket No. 11, p. 54 of 1107). Plaintiff can lift and carry fifteen pounds, although not far (Docket No. 11, p. 58 of 1107). Plaintiff stated she can carry her purse, which she testified weighed at least ten pounds (Docket No. 11, p. 58 of 1107). Plaintiff spends most of her time seated, although she has to alternate between sitting and laying down (Docket No. 11, p. 59 of 1107). Plaintiff stated she has difficulty sleeping because of the pain and is jumpy as a result of being shot (Docket No. 11, p. 59 of 1107).

## 2.  VOCATIONAL EXPERT TESTIMONY

Having familiarized herself with Plaintiff's background and employment history, VE Sindelar testified that Plaintiff's past work as a security guard was light and semi-skilled (Docket No. 11, p. 70 of 1107). ALJ Prinsloo then posed his first hypothetical question:

> . . . please assume you are dealing with an individual the same age as the claimant, with the same educational background, past work experience. Further assume this individual retains a residual functional capacity where work at any exertion level is limited to no more than superficial interaction with the public or coworkers, and cannot perform work at a straight

production-rate pace. Would this individual be able to perform any of the claimant's past relevant jobs?

(Docket No. 11, p. 70 of 1107). Given these limitations, VE Sindelar indicated such an individual could perform Plaintiff's past relevant work (Docket No. 11, p. 71 of 1107).

The ALJ went on to inquire as to whether there would be any other jobs in the national economy such an individual could perform, to which the VE answered in the affirmative (Docket No. 11, p. 71 of 1107). VE Sindelar indicated the individual could perform various other jobs, including: (1) checker, listed under DOT[3] 222.687-010, for which there are 72,000 positions nationally and 1,600 in the state; (2) office mail clerk, listed under DOT 209.687-026, for which there are 137,300 positions nationally and 5,400 in the state; and (3) assembler (no production quotas), listed under DOT 706.687-010, for which there are 24,700 positions nationally and 1,050 in the state (Docket No. 11, p. 71 of 1107).

ALJ Prinsloo then posed his second hypothetical question:

Please assume you're dealing with an individual the same as age the claimant with the same educational background and past work experience. Further assume this individual has the limitations described in Hypothetical 1, but is unable to engage in sustained work activity for a full eight-hour day on a regular and consistent basis. Would there be any jobs this individual could perform?

(Docket No. 11, p. 72 of 1107). Given these limitations, the VE indicated there would be no jobs such an individual could perform (Docket No. 11, p. 72 of 1107).

On cross examination, Plaintiff's counsel inquired as to what the restriction "no superficial interaction" meant to the VE (Docket No. 11, p. 72 of 1107). VE Sindelar stated that no superficial interaction ruled out arbitration, negotiation, confrontation, and any higher levels of interaction

---

[3] Dictionary of Occupational Titles.

(Docket No. 11, pp. 72-73 of 1107). Counsel also inquired as to whether or not any of the other jobs provided by the VE required production quotas, to which the VE responded in the negative (Docket No. 11, p. 73 of 1107). According to the VE, each of the other jobs provided allows an individual to be paid based on the amount of work actually completed, absent any production or speed quotas (Docket No. 11, p. 72 of 1107). Finally, counsel inquired as to whether these jobs must be performed "opiate-free," meaning an employee could not have opiates in her system (Docket No. 11, pp. 74-75 of 1107). VE Sindelar indicated that these jobs required an individual to be opiate-free (Docket No. 11, p. 75 of 1107).

### B.    MEDICAL RECORDS

#### 1.    PHYSICAL HEALTH ISSUES

Plaintiff's medical records date back to April 1, 2008, when Plaintiff presented to the Fisher-Titus Medical Center Emergency Room ("Fisher ER") complaining of pain at the site of a previous hernia, which had been repaired with mesh in December 2007 (Docket No. 11, pp. 284, 442 of 1107). Plaintiff was diagnosed with a recurrent ventral incisional hernia and admitted to the hospital (Docket No. 11, p. 285 of 1107). Although doctors were able to immediately reduce Plaintiff's recurring hernia, she underwent a second surgery to remove infected mesh on April 2, 2008 (Docket No. 11, p. 292 of 1107). Plaintiff was discharged on April 5, 2008 (Docket No. 11, p. 283 of 1107).

On April 12, 2008, Plaintiff returned to the Fisher ER complaining of abdominal pain at the site of her incision (Docket No. 11, p. 297 of 1107). Plaintiff was admitted and diagnosed with MRSA (Docket No. 11, p. 297 of 1107). Her wound was drained (Docket No. 11, p. 792 of 1107), and Plaintiff was discharged on April 17, 2008 (Docket No. 11, p. 297 of 1107). Plaintiff returned on April 27, 2008, complaining of a rash (Docket No. 11, p. 784 of 1107). She was diagnosed with abdominal

pain secondary to a wound infection (Docket No. 11, p. 789 of 1107).

Plaintiff presented to the MetroHealth Emergency Room ("MetroHealth ER") on May 8, 2008, complaining of diffuse abdominal pain, rapid heart rate, and chill episodes (Docket No. 11, p. 442 of 1107). Plaintiff was admitted to the hospital out of fear Plaintiff's mesh had again become infected (Docket No. 11, p. 443 of 1107). On June 6, 2008, Plaintiff saw Dr. Joseph A. Posluszny, Jr. ("Dr. Posluszny") complaining of chronic abdominal pain (Docket No. 11, p. 976 of 1107). Dr. Posluszny referred Plaintiff to a psychiatrist and a plastic surgeon for evaluation of hernia management (Docket No. 11, p. 976 of 1107). Plaintiff saw plastic surgeon Dr. Adam Cash ("Dr. Cash") on June 12, 2012, still complaining of pain in her abdomen (Docket No. 11, p. 967 of 1107). Dr. Cash recommended Plaintiff undergo removal of the chronically infected abdominal mesh (Docket No. 11, p. 967 of 1107).

On July 1, 2008, Plaintiff saw pain management specialists Noreen Griffin ("Ms. Griffin"), a certified nurse practitioner, and Dr. Kutaiba Tabbaa ("Dr. Tabbaa") (Docket No. 11, p. 964 of 1107). Plaintiff complained of pain on the left side of her abdomen, rating her pain level at a nine out of a possible ten (Docket No. 11, p. 964 of 1107). Plaintiff was very tearful during the appointment, sometimes crying so hard she could not talk (Docket No. 11, p. 965 of 1107). Plaintiff would not allow the doctor to touch her abdomen to complete an examination (Docket No. 11, p. 966 of 1107). Dr. Tabbaa told Plaintiff she needed to be active and work on getting better without medications (Docket No. 11, p. 966 of 1107). Plaintiff returned to Ms. Griffin on July 30, 2008, and complained of not being able to sleep through the night (Docket No. 11, p. 427 of 1107). Ms. Griffin adjusted Plaintiff's medications (Docket No. 11, p. 428 of 1107). On August 18, 2008, Plaintiff underwent an elective

8

panniculectomy,[4] mesh removal, and abdominal wall reconstruction to deal with the infected mesh in her abdomen (Docket No. 11, pp. 419, 425 of 1107).

Plaintiff returned to Ms. Griffin on August 27, 2008, complaining that her pain medications were not working (Docket No. 11, p. 416 of 1107). At that time, Plaintiff was evaluated by Dr. Brendan Astley ("Dr. Astley") (Docket No. 11, p. 417 of 1107). Dr. Astley was concerned about Plaintiff's pain and multiple mental health issues and recommended inpatient therapy (Docket No. 11, p. 417 of 1107). He increased Plaintiff's Methadone just slightly to help relieve her pain but instructed Plaintiff to only take the prescribed Dilaudid if absolutely necessary (Docket No. 11, p. 417 of 1107).

On September 28, 2008, Plaintiff saw plastic surgeon Dr. Donald Harvey ("Dr. Harvey") (Docket No. 11, p. 962 of 1107). Plaintiff continued to complain of pain, despite her involvement in pain management (Docket No. 11, p. 962 of 1107). Plaintiff's mother was concerned about the possibility that Plaintiff was on too many pain medications (Docket No. 11, p. 962 of 1107). Dr. Harvey noted Plaintiff displayed no signs of infection and reported Plaintiff's pain was controlled through pain management (Docket No. 11, p. 962 of 1107). He encouraged Plaintiff to be ambulatory (Docket No. 11, p. 962 of 1107).

Plaintiff returned to Ms. Griffin on October 3, 2008 (Docket No. 11, p. 407 of 1107). At that time, Plaintiff was only taking Methadone and Roxicodone, which successfully controlled her pain (Docket No. 11, p. 407 of 1107). Ms. Griffin again suggested Plaintiff may better benefit from a more comprehensive program (Docket No. 11, p. 408 of 1107). On October 9, 2008, Plaintiff saw Dr. Daniel A. Medalie, MD ("Dr. Medalie") to follow up from her August 2008 surgery (Docket No. 11, p. 412 of

---

[4] The excision of an apron of abdominal subcutaneous fat that lacks adequate supportive tissue from people who are morbidly obese. TABER'S CYCLOPEDIC MEDICAL DICTIONARY.

1107). Dr. Medalie noted Plaintiff's scars were healing well (Docket No. 11, p. 412 of 1107).

Plaintiff saw Ms. Griffin on November 7, 2008 (Docket No. 11, p. 401 of 1107). Plaintiff was very tearful and indicated she had not been taking her Oxycodone (Docket No. 11, p. 401 of 1107). Plaintiff also stated she had not been seeing her psychiatrist due to "social reasons" and was almost out of Valium (Docket No. 11, p. 401 of 1107). Ms. Griffin again recommended more comprehensive care (Docket No. 11, p. 402 of 1107). On December 11, 2008, Plaintiff transitioned out of Ms. Griffin's care into a more comprehensive rehabilitation program (Docket No. 11, p. 398 of 1107).

Plaintiff saw Dr. Roshni M. Kundranda, MD ("Dr. Kundranda") on January 9, 2009, complaining of low and mid-back pain after a physical assault by her boyfriend (Docket No. 11, p. 348 of 1107). Plaintiff also had a corneal laceration of unknown origin (Docket No. 11, p. 348 of 1107). Plaintiff was crying, had poor eye contact, and slumped posture (Docket No. 11, p. 350 of 1107). Her radiology evaluations were normal (Docket No. 11, pp. 354-57 of 1107) and Plaintiff was referred for psychiatric and pain management care (Docket No. 11, p. 350 of 1107). By April 2009, Plaintiff reported to Dr. Kundranda that she was doing much better (Docket No. 11, p. 335 of 1107). She had weaned herself off the methadone and had made plans to see a psychiatrist (Docket No. 11, p. 335 of 1107). Plaintiff expressed concerns about her excess skin created by her extreme weight loss (Docket No. 11, p. 335 of 1107). Dr. Kundranda referred her to a plastic surgeon (Docket No. 11, p. 337 of 1107).

On October 23, 2009, Plaintiff was brought, via ambulance, to the Allen Community Hospital Emergency Room ("Allen ER") after suffering multiple gunshot wounds to her face (Docket No. 11, p. 534 of 1107). She was then airlifted to the MetroHealth ER (Docket No. 11, p. 684 of 1107). Plaintiff had multiple wounds to her face, right arm and shoulder, and right leg and thigh (Docket No. 11, p.

10

534 of 1107). Plaintiff also had small wounds in both upper eyelids without penetration of the eyes (Docket No. 11, p. 698 of 1107). Plaintiff was amnestic concerning the actual shooting (Docket No. 11, p. 535 of 1107). On October 28, 2009, Plaintiff saw Dr. Alexander Kosmidis ("Dr. Kosmidis") complaining of a throbbing headache behind both eyes (Docket No. 11, p. 680 of 1107). Dr. Kosmidis noted Plaintiff's eyelid wounds were healing and she had a normal eye examination (Docket No. 11, p. 681 of 1107).

On November 3, 2009, Plaintiff began treatment at the Comprehensive Pain Care Center ("CPCC") (Docket No. 11, p. 763 of 1107). Plaintiff presented with pain in her right upper and lower extremities, right facial pain, and abdominal pain (Docket No. 11, p. 763 of 1107). She described the pain as constant and burning and reported improvement with Percocet (Docket No. 11, p. 763 of 1107). Plaintiff stated she only slept four hours per night, occasionally drank alcohol, and smoked one-half pack of cigarettes per day (Docket No. 11, p. 764 of 1107). She was started on a Fentanyl patch and Neurontin (Docket No. 11, p. 768 of 1107).

Plaintiff returned to CPCC multiple times between November 2009 and February 2011 (Docket No. 11, pp. 768-1063 of 1107). During that time Plaintiff's overall pain sometimes increased (Docket No. 11, pp. 856, 860, 865, 875, 886, 891, 897, 902, 912 of 1107) and sometimes decreased (Docket No. 11, pp. 768, 773, 850, 860, 870, 880, 886, 891, 902, 907, 918, 923 of 1107). During a February 2, 2011, appointment, Plaintiff indicated her arm pain was totally gone (Docket No. 11, p. 923 of 1107). Plaintiff was always asked to rate her level of pain (Docket No. 11, pp. 768-1063 of 1107). During her course of treatment, Plaintiff's pain level varied widely, as follows: (1) right arm and leg pain ranged from two to ten; (2) facial pain ranged from three to ten; and (3) abdominal pain ranged from eight to ten (Docket No. 11, pp. 768-1063 of 1107). CPCC staff gradually increased Plaintiff's Fentanyl from

11

twenty-five milligrams every seventy-two hours (Docket No. 11, p. 768 of 1107) to one hundred milligrams by February 2011 (Docket No. 11, p. 924 of 1107). Plaintiff's Neurontin dose remained unchanged (Docket No. 11, pp. 768, 924 of 1107).[5]

2.  **MENTAL HEALTH ISSUES**

On June 2, 2008, Plaintiff underwent a mental health assessment with staff at Firelands Counseling and Recovery Services ("Firelands") (Docket No. 11, p. 318 of 1107). At that time, Plaintiff was residing in the Twilight Gardens Nursing Home for rehabilitation from her MRSA infection (Docket No. 11, p. 318 of 1107). Plaintiff presented with depression, anxiety, agitation, hopelessness, helplessness, and feeling down (Docket No. 11, p. 318 of 1107). Plaintiff felt out of control and was afraid of ending up on disability and not graduating from cosmetology school (Docket No. 11, pp. 318-19 of 1107). She denied any alcohol or substance abuse (Docket No. 11, p. 320 of 1107). Plaintiff was diagnosed with adjustment disorder with mixed anxiety and depressed mood, chronic MRSA, and assigned a Global Assessment of Functioning ("GAF") score of fifty-two[6] (Docket No. 11, p. 321 of 1107). She was discharged from Firelands on August 21, 2008 (Docket No. 11, p. 323 of 1107).

On February 20, 2009, Plaintiff began treatment at the Nord Center (Docket No. 11, p. 466 of 1107). Plaintiff presented with depression and anxiety and claimed to be a victim of domestic violence,

_____

[5] It should be noted that Plaintiff had numerous visits to various emergency rooms for a wide variety of complaints, including tooth pain, urinary tract infections, lower abdominal pain and diarrhea, wrist lacerations, knee pain, and sinus pain (Docket No. 11, pp. 545, 556-57, 589-98, 606, 614-16, 661, 668, 625, 636, 641, 705, 720-28 of 1107).

[6] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score of fifty-two indicates moderate symptoms or moderate difficulty in social, occupation, or school functioning. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV) 34 (Am. Psychiatric Ass'n) (4th ed. 1994).

afraid to sleep at night due to threats made by her boyfriend (Docket No. 11, p. 466 of 1107). Plaintiff admitted to being addicted to Methadone and reported staying in the house all day, sometimes not even showering (Docket No. 11, pp. 467, 472, 478 of 1107). Plaintiff was disheveled, had average demeanor and eye contact, and displayed slowed activity and slurred speech (Docket No. 11, p. 477 of 1107). Plaintiff was assigned a GAF score of forty-one (Docket No. 11, p. 475 of 1107).[7]

Plaintiff had numerous visits to the Nord Center from February 2009 through July 2010 (Docket No. 11, p. 466-1066 of 1107). Plaintiff's disposition and demeanor varied wildly during this time. For example, on April 14, 2009, Plaintiff claimed to be feeling more optimistic and reported getting out more (Docket No. 11, p. 494 of 1107). She also expressed interest in recording a music CD (Docket No. 11, p. 494 of 1107). Plaintiff had reportedly weaned herself off of Methadone (Docket No. 11, p. 494 of 1107). However, just six days later, on April 20, 2009, Plaintiff appeared very meek and tearful during her counseling session, failing to make eye contact (Docket No. 11, p. 492 of 1107). Plaintiff did not display any evidence of a formal thought disorder (Docket No. 11, p. 492 of 1107). On January 27, 2010, Plaintiff's mother reported Plaintiff's behavior was becoming increasingly erratic and difficult to manage (Docket No. 11, p. 938 of 1107). Plaintiff's mother relayed an incident where Plaintiff tried to jump out of a moving car at forty miles per hour (Docket No. 11, p. 938 of 1107). Plaintiff was well-groomed and independent with her activities of daily living and refused emergency services (Docket No. 11, p. 938 of 1107). She was diagnosed with anxiety disorder not otherwise specified, personality disorder not otherwise specified, and assigned a GAF score of fifty[8] (Docket No.

---

[7] A GAF score of forty-one indicates serious symptoms or any serious impairment in social, occupation, or school functioning. DSM-IV at 34.

[8] A GAF score of fifty indicates serious symptoms or any serious impairment in social, occupation, or school functioning. DSM-IV at 34.

11, p. 938 of 1107).

During her time at the Nord Center, Plaintiff was very medication-focused (Docket No. 11, p. 1057 of 1107), but failed to respond to numerous medications, including Prozac, Wellbutrin, Zoloft, Lexapro, Paxil, and Cymbalta (Docket No. 11, p. 1063 of 1107). By the end of treatment, she was on a regimen of Valium and Lamictal (Docket No. 11, p. 1057 of 1107). Plaintiff had several no-show and cancelled appointments (Docket No. 11, pp. 486, 489, 496, 498, 748, 751, 949, 955 of 1107).

## C.   EVALUATIONS

### 1.   PSYCHIATRIC EVALUATION

On April 20, 2009, Plaintiff underwent a psychiatric evaluation with Nancy Danielson, APRN, CNS ("Ms. Danielson") at the Nord Center (Docket No. 11, pp. 480-84 of 1107). Plaintiff indicated she avoided stores and crowds (Docket No. 11, p. 481 of 1107). She displayed multiple depressive symptoms, including anhedonia, avolition, anergia, crying spells, dysphoria, irritability, and insomnia secondary to nightmares (Docket No. 11, p. 481 of 1107). During the session, Plaintiff appeared very meek and tearful (Docket No. 11, p. 483 of 1107). She rarely made eye contact with Ms. Danielson and expressed feelings of worthlessness and hopelessness (Docket No. 11, p. 483 of 1107). Plaintiff was oriented in three spheres and displayed no evidence of a formal thought disorder (Docket No. 11, p. 483 of 1107). Plaintiff was diagnosed with PTSD, major depression (recurrent), and opioid dependence in early remission (Docket No. 11, p. 483 of 1107). She was assigned a GAF score of forty-one (Docket No. 11, p. 484 of 1107).

### 2.   MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

On September 1, 2009, Plaintiff underwent a Mental Residual Functional Capacity Assessment with state examiner Dr. Patricia Semmelman, Ph.D ("Dr. Semmelman") (Docket No. 11, pp. 499-502

14

of 1107). Dr. Semmelman found Plaintiff to be moderately limited in several categories, including Plaintiff's ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) work in coordination with or proximity to others without being distracted by them; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (5) interact appropriately with the general public; (6) accept instructions and respond appropriately to criticism from supervisors; (7) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (8) respond appropriately to changes in the work setting (Docket No. 11, pp. 499-500 of 1107).

### 3.  PSYCHIATRIC REVIEW TECHNIQUE

On September 22, 2009, state examiner Dr. John Waddell, Ph.D ("Dr. Waddell") completed a Psychiatric Review Technique for Plaintiff (Docket No. 11, pp. 505-18 of 1107). Dr. Waddell noted Plaintiff suffered from affective disorder, anxiety disorder, PTSD, and opioid dependency in reported remission (Docket No. 11, pp. 508-13 of 1107). In assessing "Paragraph B" criteria,[9] Dr. Waddell found Plaintiff to have moderate difficulty maintaining: (1) activities of daily living; (2) social functioning; and (3) concentration, persistence, and pace (Docket No. 11, p. 515 of 1107). Plaintiff had no episodes of decompensation (Docket No. 11, p. 515 of 1107). Dr. Waddell did not find the presence of any "Paragraph C" criteria[10] (Docket No. 11, p. 516 of 1107).

### 4.  PSYCHIATRIC EVALUATION

---

[9] Paragraph B criteria "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

[10] Paragraph C criteria also "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

15

On May 10, 2010, Plaintiff underwent a second psychiatric evaluation with Ms. Danielson (Docket No. 11, pp. 940-43 of 1107). Plaintiff stated she felt anxious most of the time, feeling some sense of impending doom and death (Docket No. 11, p. 940 of 1107). Her depressive symptoms included isolation, increased irritability, dysphoria, and crying spells (Docket No. 11, p. 940 of 1107). Plaintiff became upset very quickly and had a hard time calming herself (Docket No. 11, p. 940 of 1107). Plaintiff was neatly groomed and hygienic (Docket No. 11, p. 942 of 1107). During the evaluation, Plaintiff maintained good eye contact, although she teared up frequently when discussing stress at home (Docket No. 11, p. 942 of 1107). There was no report or evidence of psychotic symptoms (Docket No. 11, p. 942 of 1107). Plaintiff presented with anxiety and was labile (Docket No. 11, p. 942 of 1107). Plaintiff was diagnosed with PTSD, major depression (recurrent), opioid dependence, personality disorder not otherwise specified, and dependent and borderline traits (Docket No. 11, p. 942 of 1107). She was assigned a GAF score of fifty (Docket No. 11, p. 942 of 1107). Ms. Danielson encouraged Plaintiff to gradually reduce and stop her Valium regimen, but Plaintiff seemed resistant to this idea (Docket No. 11, pp. 942-43 of 1107).

## IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920. *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007). DIB and SSI are available only for those who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin,* 475 F.3d at 730 (*citing* 42

16

U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim.  First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits  . . .  physical or mental ability to do basic work activities." *Id*. (*citing Abbott,* 905 F. 2d at 923).  At the third step, a claimant is presumed to be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant

17

is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform. *Colvin*, 475 F.3d at 730 (*citin*g *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730 (*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Prinsloo made the following findings:

1.  Plaintiff met the insured status requirements of the Social Security Act through June 30, 2011.

2.  Plaintiff has not engaged in substantial gainful activity since April 1, 2008, the alleged onset date.

3.  Plaintiff has the following severe impairments: status post gastric bypass and hernia repair surgeries with complications, drug abuse disorder, chronic pain disorder, anxiety disorder, post traumatic stress disorder, and depressive disorder.

4.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, App. 1.

5.  Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels with the following non-exertional limitations: (1) no more than superficial interaction with the public or coworkers; and (2) no work at a strict production-rate pace.

6.  Plaintiff is capable of performing past relevant work as security guard. This work does not require the performance of work-related activities precluded by Plaintiff's residual functional capacity.

7.  Plaintiff has not been under a disability, as defined in the Social Security Act, from April 1, 2008, through the date of this decision.

18

(Docket No. 11, pp. 17-30 of 1107). ALJ Prinsloo denied Plaintiff's request for DIB and SSI benefits (Docket No. 11, pp. 29-30 of 1107).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs*., 966 F.2d 1028, 1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

**A.    PLAINTIFF'S ALLEGATIONS**

In her Brief on the Merits, Plaintiff makes numerous assignments of error:

1.    The decision erroneously rejected Dr. Semmelman's opinions, which recognized more restrictions than the ALJ's findings, and the decision failed to note some of

Dr. Semmelman's opinions altogether.

2.  The decision found moderate restrictions in both social functioning and concentration, persistance, or pace, yet those moderate restrictions were not fully reflected in the residual functional capacity finding or in the hypothetical question.

3.  Plaintiff's limitations varied between the alleged onset date of April 1, 2008, and the decision of April 21, 2011, yet the decision noted no change in residual functional capacity.

4.  The ALJ's last hypothetical question raised the relevant issue of whether Plaintiff could sustain full eight-hour days on a regular and continuing basis, yet the decision did not address that result-determinative issue.

5.  The decision failed to make the required inquiry into the demands of Plaintiff's past work as a security guard and make the required function-by-function comparison of those demands with Plaintiff's abilities.

6.  The VE testified that a person could not perform Plaintiff's past work or other work at step five if she took opiates. Plaintiff was prescribed opiates.

7.  Past work as a security guard had more than superficial interaction with the public.

8.  The decision should not be affirmed on the VE's testimony about step five (other work), as the ALJ made no findings about other jobs.

(Docket No. 13).

**B.    DEFENDANT'S RESPONSE**

Defendant contends the ALJ properly evaluated Plaintiff's residual functional capacity, given:

(1) the lack of specific restrictions on Plaintiff's ability to interact with the general public; and (2) the

ALJ's proper reliance on the VE's testimony (Docket No. 14, pp. 9-12 of 16). Defendant also alleges

the ALJ properly considered Plaintiff's past work, given the specificity of the analysis performed

(Docket No. 14, pp. 12-13 of 16). Finally, Defendant argues the ALJ did not need to proceed to step

five of the evaluation, given Plaintiff's ability to return to her past relevant work as a security guard

(Docket No. 14, pp. 13-15 of 16).

C.    DISCUSSION

While Plaintiff's arguments are numerous, they can essentially be grouped into three basic categories: (1) medical source opinions; (2) residual functional capacity; and (3) past relevant work. The discussion will proceed accordingly.

1.    MEDICAL SOURCE OPINIONS

Plaintiff contends that the ALJ erroneously rejected the opinion of state examiner Dr. Semmelman, given the ALJ's failure to recognize some of the opinion and/or adopt the reported restrictions in their entirety. Plaintiff's argument is without merit.

Following a September 2009 Mental Residual Functional Capacity Assessment, Dr. Semmelman concluded Plaintiff was moderately limited in several categories, including Plaintiff's ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) work in coordination with or proximity to others without being distracted by them; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (5) interact appropriately with the general public; (6) accept instructions and respond appropriately to criticism from supervisors; (7) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (8) respond appropriately to changes in the work setting (Docket No. 11, pp. 499-500 of 1107). Dr. Semmelman also concluded Plaintiff can

> understand and follow 1-3 step uncomplicated oral and written directions. Memory intact. Concentration and attention is moderately impaired at times. She can interact occasionally and superficially and receive instructions and ask questions appropriately in a smaller or more solitary and less public to nonpublic work setting. She can cope with ordinary and routine changes in a work setting that is not fast paced or of high demand.

(Docket No. 11, p. 502 of 1107). ALJ Prinsloo discounted the opinion of Dr. Semmelman, assigning it

21

only little weight, explaining the examiner did not have access to Plaintiff's more recent treatment records or her testimony (Docket No. 11, p. 29 of 1107).

Under Social Security regulations, "medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including . . . symptoms, diagnosis and prognosis, what [he] can still do despite impairment(s), and [his] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a), 416.927(a). Unless the Commissioner gives "controlling weight" to the opinion of a claimant's treating source, he must consider a variety of factors in deciding the weight given to any medical opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). These factors include: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability of the opinion; (4) consistency of the opinion with the record as a whole; and (5) any specialization of the treating physician. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6). "Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i).

Here, although ALJ Prinsloo did not include, in specific detail, each restriction suggested by Dr. Semmelman, the ALJ did, in fact, capture the overwhelming theme of Dr. Semmelman's opinion: only superficial interaction with the public and coworkers and no production-rate paced work (Docket No. 11, p. 21 of 1107). Furthermore, based on the regulations, the ALJ was not required to accept Dr. Semmelman's restrictions in their entirety, if at all. *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i). Therefore, the Magistrate finds Plaintiff's assignment of error to be without merit and recommends the decision of the Commissioner be affirmed as to the first issue.

22

2.     RESIDUAL FUNCTIONAL CAPACITY

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant is not disabled.

Plaintiff argues three assignments of error related to residual functional capacity. First, Plaintiff alleges her restrictions concerning social functioning, concentration, persistence, and pace were not fully reflected in the ALJ's residual functional capacity assessment (Docket No. 13). Second, Plaintiff claims that the ALJ's residual functional capacity assessment should have, but failed to, include her varied limitations. (Docket No. 13). Finally, Plaintiff alleges the ALJ failed to incorporate her limitation on working eight-hour days (Docket No. 13). These arguments are without merit.

a.     MODERATE RESTRICTIONS

With regard to speed- and pace-based limitations, Plaintiff relies, *inter alia*, on *Ealy v. Comm'r of Soc. Sec.* (594 F.3d 504 (6th Cir. 2010)), for the proposition that the ALJ's hypothetical question

23

must include pace or speed-based restrictions given his conclusion that Plaintiff had moderate limitations with regard to social functioning, concentration, persistence, and pace (Docket No. 13, p. 5 of 14). Plaintiff is incorrect. In *Ealy*, the plaintiff's doctor *specifically* limited him to "simple repetitive tasks [for] [two-hour] segments over an eight-hour day where speed was not critical." 594 F.3d at 516. In the case at hand, no medical professional has placed Plaintiff under such a severe or specific restriction (Docket No. 11, pp. 279-1107 of 1107).

Although Dr. Waddell found Plaintiff to have moderate difficulties with regard to concentration, persistence, and pace (Docket No. 11, p. 515 of 1107), this Court has noted

> *Ealy* does not require further limitations in addition to limiting a claimant to simple repetitive tasks for every individual found to have moderate difficulties in concentration, persistence, or pace. Instead, *Ealy* stands for a limited, fact-based ruling in which the claimant's particular moderate limitations required additional speed- and pace-based restrictions.

*Jackson v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 120476, *11 (N.D. Ohio 2011). Here, unlike in *Ealy*, Plaintiff refers to no objective evidence to suggest she had any greater limitations than those identified by ALJ Prinsloo in his posed hypothetical question (Docket No. 11, pp. 279-1107 of 1107). Therefore, Plaintiff's second assignment of error is without merit and the Magistrate recommends the decision of the Commissioner be affirmed.

### b.  VARIED LIMITATIONS

Second, Plaintiff argues her limitations varied between the alleged onset date of April 1, 2008, and the ALJ's decision of April 22, 2011, yet no change in residual functional capacity was noted (Docket No. 13, p. 6 of 14). Plaintiff alleges ALJ Prinsloo's residual functional capacity assessment "contains no rationale for failing to separate the periods of time, or how work would have been possible on a sustained basis during that time" (Docket No. 13, p. 6 of 14). This argument is also

without merit.

Plaintiff appears to be arguing that the ALJ did not review all of the record, namely the time period from April 1, 2008, through April 14, 2009, when Plaintiff initially suffered a majority of her physical health issues (Docket No. 13, p. 6 of 14). This is simply not true. ALJ Prinsloo went through, in great detail, Plaintiff's medical records, beginning with her gastric bypass surgery in 2006 through her skin removal surgery in January 2011 (Docket No. 11, pp. 21-26 of 1107). Furthermore, such an analysis would be irrelevant. By the time ALJ Prinsloo reviewed the case, most of Plaintiff's initial physical impairments had subsided. As the ALJ noted, Plaintiff's MRSA resolved within three months of the initial infection and Plaintiff testified she has not had any related issues since (Docket No. 11, pp. 19, 45 of 1107). There is no evidence in the record of Plaintiff's other alleged impairments, namely asthma, malabsorption disorder, irritable bowel, and loss of eyesight (Docket No. 11, pp. 19, 279-1107 of 1107).

Therefore, ALJ Prinsloo properly considered all medical records from the relevant time period. This Magistrate finds Plaintiff's third assignment of error to be without merit and recommends the decision of the Commissioner be affirmed.

### c.   RESULT-DETERMINATIVE ISSUE

Plaintiff next alleges the ALJ had a duty to include the VE's answer to whether or not a failure by a hypothetical claimant to work an eight-hour day on a regular and consistent basis would preclude work (Docket No. 13, pp. 7-8 of 14). According to Plaintiff, "[i]f the question had not been material, the ALJ would not have asked it. Once the ALJ raises a result-determinative issue as being relevant, the decision should resolve it" (Docket No. 13, p. 7 of 14). Plaintiff's argument is without merit.

First, Plaintiff cites to a well-known Sixth Circuit opinion to support the proposition that, once

25

a material question has been asked yet failed to be answered in the ultimate decision, the claimant "might be especially bewildered when told by an administrative bureaucracy that she is not [disabled] unless some reason for the agency's decision is supplied." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). This quote must be read in its full context. In *Wilson*, the Court was discussing the need to provide reasons for discounting the opinion of a claimant's treating physician who had deemed the claimant disabled. *Id*. This is not the case here.

Furthermore, by using this quote, Plaintiff *assumes* that an ALJ may only ask questions that are material to the issues at hand and must subsequently incorporate the answer into his opinion (Docket No. 13, p. 7 of 14). While the regulations do state that an ALJ may "ask the witness any questions material to the issues" (20 C.F.R. § 404.950(e)), this does not mean  an ALJ is required to incorporate the answers into his final decision. An ALJ's decision must be based on substantial evidence. *McClanahan*, 474 F.3d at 832-33. Based on an examination of the record in its entirety, there is no evidence to support a finding that Plaintiff cannot consistently work an eight-hour day (Docket No. 11, pp. 279-1107 of 1107). Therefore, ALJ Prinsloo was not required to include this in his decision, despite having asked the question during the administrative hearing. Plaintiff's fourth assignment of error is without merit and the Magistrate recommends the decision of the Commissioner be affirmed.

### 3.    PAST RELEVANT WORK

Plaintiff alleges the ALJ was required to perform a full investigation into the mental and physical demands of Plaintiff's past relevant work which, in this case, is a security guard (Docket No. 13, p. 8 of 14). Plaintiff further alleges the ALJ was required to perform a function-by-function comparison of those demands and Plaintiff's current residual functional capacity (Docket No. 13, p. 8 of 14). The Magistrate agrees..

At step four of the required sequential analysis, a claimant will be found not disabled if she has "the residual functional capacity to do [her] past relevant work." 20 C.F.R. §§ 404.1560(b)(3), 416.960(b)(3). The claimant bears the burden of showing an inability to perform her past relevant work. *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980). However, "courts have found that an ALJ's decision lacks substantial evidence as to a claimant's ability to return to his past relevant work unless the ALJ determines the demands of that work and relates those demands to the claimant's current physical abilities." *Baker v. Astrue*, 2012 U.S. Dist. LEXIS 134671, *8 (N.D. Ohio 2012). Without this analysis, remand is required. *Id.* (*citing Branch v. Astrue*, 2010 U.S. Dist. LEXIS 130328 (N.D. Ohio 2010)).

In determining a claimant's ability to perform past relevant work, the Social Security Administration states:

> A decision that an individual is not disabled . . . must contain adequate rationale and findings dealing with all of the first four steps in the sequential evaluation process. In finding that an individual has the capacity to perform a past relevant job, the determination or decision must contain among the findings the following specific findings of fact:
>
> > 1. A finding of fact as to the individual's RFC.
> >
> > 2. A finding of fact as to the physical and mental demands of the past job/occupation.
> >
> > 3. A finding of fact that the individual's RFC would permit a return to his or her past job or occupation.

1982 SSR LEXIS 27, *10 (1982).

ALJ Prinsloo found Plaintiff has the residual functional capacity "to perform a full range of work at all exertional levels but with the following nonexertional limitations: no more than superficial interaction with the public or co-workers and no work at a strict production rate pace" (Docket No. 11, p. 21 of 1107). At step four of his sequential evaluation, ALJ Prinsloo found Plaintiff "capable of

performing past relevant work as a security guard. This work does not require the performance of work-related activities precluded by [Plaintiff's] residual functional capacity" (Docket No. 11, p. 29 of 1107. The ALJ based this decision on the testimony of the VE (Docket No. 11, p. 29 of 1107).

The ALJ made findings of fact as to Plaintiff's residual functional capacity and found that this residual functional capacity would allow Plaintiff to return to past relevant work as a security guard (Docket No. 11, p. 29 of 1107). However, the ALJ failed to make any findings of fact in his decision as to the physical and mental demands of Plaintiff's past relevant work as a security guard as she *actually* performed it. During the administrative hearing, the ALJ posed no questions as to the specific demands of Plaintiff's job (Docket No. 11, pp. 37-75 of 1107). Likewise, the ALJ's decision contains no discussion of the actual requirements of Plaintiff's job (Docket No. 11, pp. 17-30 of 1107).

Without these necessary findings of fact, ALJ Prinsloo failed to provide substantial evidence to support his step four finding. Therefore, the Magistrate recommends the Court reverse and remand this issue for reevaluation and proper analysis consistent with this opinion. Since a remand may impact Plaintiff's other assertions concerning step four findings, namely whether Plaintiff's work as a security guard required more than superficial interaction with the general public and whether Plaintiff's prescribed opiate use impacts her ability to return to past relevant work, the Court declines to address them at this time. Furthermore, because findings at step four of the sequential analysis necessarily affect the need for and findings of step five of the sequential analysis, the Court declines to address Plaintiff's assignments of error regarding step five, namely Plaintiff's prescribed use of opiates and the VE's expert testimony, at this time.

28

**VIII. CONCLUSION**

For the foregoing reasons, this Magistrate recommends the decision of the Commissioner be affirmed in part and reversed and remanded in part. On remand, the Commissioner should properly consider steps four and five of the sequential evaluation, in accordance with this opinion.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   August 13, 2013

## IX. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.